COMMONWEALTH *vs.* BOSTON WHITE CROSS MILK COMPANY.

Suffolk. March 13, 1911. — May 18, 1911.

Present: KNOWLTON, C. J., MORTON, HAMMOND, LORING, BRALEY, SHELDON, & RUGG, JJ.

*Milk. Concentrated Milk. Statute,* Construction. *Words,* "Milk."

At the trial of an indictment charging the defendant with a violation of R. L. c. 56, § 55, in having in his custody and possession with intent to sell milk to which water had been added, evidence introduced by the Commonwealth tended to show that the defendant was adding water and cream and "concentrated skim milk" to what was called "concentrated milk," and that he had the resultant mixture in his possession with intent to sell it, and that the "concentrated milk" looked like condensed milk. The Commonwealth introduced no evidence as to the composition of "concentrated milk." The defendant contended that the "concentrated milk" was not milk within the meaning of R. L. c. 56, § 55, and put in evidence which tended to show that it was a "manufactured product made from milk as a raw material" and was "a mixture of concentrated skim and pasteurized cream," that in its manufacture the cream was separated from the best fresh cow's milk and was subjected to a process of slow pasteurization which evaporated most of the water in it, destroyed the bacteria and made certain chemical changes which were beneficial; the skimmed milk was treated simultaneously to a process of evaporation, agitation and cooling which removed three fourths of its water, all odors of barns or cows, killed most of the bacteria and made some chemical changes which were beneficial, and the two products thus obtained then were united making "concentrated milk." There was no evidence as to what generally was known or dealt with in the trade as milk, or that "concentrated milk" had come to be known in the trade as milk. Subject to exceptions by the defendant, the trial judge instructed the jury in substance that the only question for them to decide was whether the substance to which the defendant added water was milk within the meaning of the statute, that they were to decide whether that product "which has been shown here, the method of producing which has been described," was "known and treated generally in the trade as milk as it comes from the cow," that if "that product" had "acquired a standing in the trade as milk, then the statute applies to it, and the defendant is guilty for adding water to it." *Held,* that the instructions were erroneous, because, as a matter of law, if the product called "concentrated milk" was produced by the methods described in the evidence, it was not milk within the meaning of the statute.

Since R. L. c. 56, § 55, which among other provisions makes it unlawful to have in one's possession with an intent to sell "milk to which water or any foreign substance has been added," is a penal statute, its scope is not to be extended beyond the natural meaning of its words, and therefore the word "milk" in the statute does not include a product called "concentrated milk" which is described as a "manufactured product made from milk as a raw material" and as "a mixture of concentrated skim and pasteurized cream," and in whose manufacture the

cream was separated from the best fresh cow's milk and was subjected to a process of slow pasteurization which evaporated most of the water in it, destroyed the bacteria and made certain chemical changes which were beneficial, the skimmed milk was treated simultaneously to a process of evaporation, agitation and cooling which removed three fourths of its water, all odors of barns or cows, killed most of the bacteria and made some chemical changes which were beneficial, and the two products thus obtained then were united.

The word "milk," as used in R. L. c. 56, § 55, making it unlawful to have in one's possession with an intent to sell "milk to which water or any foreign substance has been added," means whole or natural milk of the cow.

The word "milk," as used in R. L. c. 56, § 55, making it unlawful to have in one's possession with an intent to sell "milk to which water or any foreign substance has been added," means the normal unchanged secretion of the mammary glands of one or more healthy cows, containing not less than twelve and fifteen one-hundredths per cent of milk solids, including not less than three and thirty-five one-hundredths per cent of fat.

INDICTMENT, found and returned on July 10, 1909, charging that the defendant on June 21, 1909, "had in its custody and possession with intent to sell milk to which water had been added."

R. L. c. 56, § 55, hereinafter referred to, reads as follows: "Whoever, himself or by his servant or agent, or as the servant or agent of another person, sells, exchanges or delivers, or has in his custody or possession with intent to sell, exchange or deliver or exposes or offers for sale or exchange, adulterated milk or milk to which water or any foreign substance has been added, or milk produced from cows which have been fed on the refuse of distilleries, or from sick or diseased cows, or, as pure milk, milk from which the cream or a part thereof has been removed, and whoever sells, exchanges or delivers or has in his custody or possession with intent to sell, exchange or deliver, skimmed milk containing less than nine and three-tenths per cent of milk solids exclusive of fat, shall for a first offense be punished by a fine of not less than fifty nor more than two hundred dollars, for a second offence by a fine of not less than one hundred nor more than three hundred dollars and for a subsequent offence by a fine of fifty dollars and by imprisonment for not less than sixty nor more than ninety days."

In the Superior Court the case was tried before *Wait*, J. The evidence is summarized in the opinion. At the close of the evidence, the defendant asked the presiding judge to order a verdict of "not guilty," and for the following rulings:

"2. The word 'milk' in R. L. c. 56, § 55, as used in the phrase 'milk to which water or any foreign substance has been added,' means whole or natural milk of the cow.

"3. The word 'milk' in R. L. c. 56, § 55, as used in the same phrase, 'milk to which water or any foreign substance has been added,' means the normal unchanged secretion of the mammary glands of one or more healthy cows, and containing not less than twelve and fifteen hundredths per cent of milk solids, including not less than three and thirty-five hundredths per cent of fat.

"4. If the jury find that the substance to which the water was added by the defendant was not whole or natural milk of the cow, they must find the defendant not guilty.

"5. The substance to which the water was added by the defendant was not milk within the meaning of the word 'milk' in the phrase, 'milk to which water or any foreign substance has been added,' as used in R. L. c. 56, § 55.

"6. If after the addition of water the resultant mixture was the natural milk of the cow, it could not have been such milk prior to the addition of the water, and the defendant is not guilty.

"7. This indictment was found under R. L. c. 56, § 55. There is a separate section (§ 59) regulating the sale of condensed milk. There is no statute forbidding the adding of water to condensed milk and offering for sale or selling the liquid resulting therefrom."

The presiding judge refused to rule as requested, and submitted the case to the jury with instructions to which the defendant excepted, as stated in the opinion. The jury found the defendant guilty; and the defendant alleged exceptions.

The case was argued at the bar in March, 1911, before *Knowlton*, C. J., *Morton, Hammond, Sheldon,* & *Rugg*, JJ., and afterwards was submitted on briefs to all the justices.

*J. K. Berry*, (*E. C. Upton* with him,) for the defendant.

*A. C. Webber*, Assistant District Attorney, for the Commonwealth, submitted a brief.

SHELDON, J. The indictment charges the defendant with having in its possession with intent to sell "milk to which water had been added." The evidence was to the effect that

the defendant, having in its possession one hundred and twenty quarts of what was called " concentrated milk," had added thereto three hundred and sixty quarts of ice water, one gallon of heavy cream said to contain forty per cent of milk fat, and four gallons of " concentrated skim milk"; and that the defendant intended to sell the mixture thus prepared.

The government put in no testimony to show what was the composition of the " concentrated milk" which was the basis of the mixture intended to be sold, or how, where, or by whom this basis had been prepared or manufactured, except as follows: There was testimony that this " concentrated extract" looked like condensed milk, that it was white, thick, and of the consistency of molasses, and a half pint bottle containing a thick, white liquid was put in as an exhibit of the " extract "; and it was testified that the " extract " to which the defendant had added water had the appearance of this exhibit.  It also appeared that samples of the defendant's product had been taken by an assistant of the inspector of milk and had been analyzed by another assistant.  Neither of these assistants testified, and no analysis of the defendant's "concentrated extract or product," or of the mixture when diluted as aforesaid was put in evidence by the government.

The defendant contended that the " concentrated milk" or extract to which it had added water was not milk within the meaning of the statute.  It put in evidence of the following alleged facts, which so far as appears were not controverted: The defendant obtained a license under letters patent of the United States for the production and sale of " concentrated milk," and built and equipped a factory for that purpose in Vermont.  It bought from farmers in that vicinity the best fresh milk obtainable, such as was by test up to or above the standard fixed by the statutes of this Commonwealth.  St. 1908, c. 643.  From this milk it separated the cream, and treated separately the cream and the skimmed milk.  The cream was treated for some hours to a temperature of not more than one hundred and forty degrees by means of hot water pipes or jackets applied to the containing tanks, with the result that the cream became pasteurized at a temperature lower than that of ordinary pasteurization, the greater part of its water was evaporated. the bacteria

in it were destroyed, and beneficial changes in it took place, so as to increase the time during which it would remain fresh and sweet, whereby it was purified and yet retained the taste and all the digestive and other qualities of the best fresh cream. The skimmed milk was simultaneously treated in other tanks by a similar application of heat and at the same time agitated and cooled by cold air blasts for about five hours. This brought about the evaporation of at least three fourths of the contained water together with all odor from barns or cows, and killed the most of the bacteria in the milk. The original skimmed milk was thus concentrated and reduced to about one fourth of its original volume and was at the same time purified or pasteurized, but at a low temperature, so that the milk solids were not so far cooked or changed as to make them less digestible or nutritious than in the original milk. The cream and the skimmed milk, thus separately treated, were then in certain proportions carried through pipes into a mixing tank, where they were blended according to a formula, so that the milk solids and the fat should be not less than four times the amount required by our statutes for standard milk and the water should not exceed one fourth part of that allowed for such standard milk. This final product was the " concentrated milk " manufactured by the defendant, to which as aforesaid it added three parts of water, with the intention of selling the mixture thus produced.

Qualified experts also testified for the defendant that the chemical changes produced by the process stated were a mild form or incipient stage of curdling or coagulation of the protein of the milk, like that of the white of a soft boiled egg; that there was some precipitation of the sugar and the phosphatic substances, the water and the gases were driven off, and the bacteria were reduced in number from several hundred thousand down to a few hundreds; that the concentrated product was not milk, but a manufactured product made from milk as a raw material; that the pasteurization process used by the defendant for cream differed from ordinary pasteurization, and the concentration process used for the skimmed milk was different from any method previously known or used for evaporating or condensing milk; and that the defendant's " concentrated

milk" was not a condensed milk such as was previously known in commerce. One of these witnesses testified that whole or natural milk is milk as it is taken from the cow's udder; that the defendant's product was not milk and was not evaporated milk, which is whole or natural milk with the cream in and evaporated, and that it was not the ordinary condensed milk of commerce, but that he would call it " a mixture of concentrated skim and pasteurized cream."

There was no evidence as to what was generally known or dealt with in the trade as milk.

It appears to have been undisputed that the mixture which the defendant intended to sell, being substantially a mixture of its " concentrated milk " with three parts of water, was fully up to the standard fixed by St. 1908, c. 643, was not adulterated, and had had no water or foreign substance added to it, except, as has been stated, by the addition of three parts of water to one part of the " concentrated milk." It was assumed at the trial that in order to convict the defendant it must be shown that the " concentrated milk " to which the defendant had added water was " milk " within the meaning of R. L. c. 56, § 55.

The judge told the jury that the question was simply this : " Was the substance to which water was added by the defendant . . . milk within the meaning of the particular statute ? " He said that milk was the " normal secretion from the mammary glands of the cow substantially in the form in which it is taken from the cow, . . . or any substance generally known or dealt with in the trade as milk as already defined. . . . If cream is generally known in the trade that way it is milk; if chalk and water are generally known in the trade and generally dealt with in the trade as milk, so that when a man says he wants to buy milk, in the trade it is understood chalk and water can be given to him, then that is milk within the language of that statute. But unless chalk and water is so understood, or unless any other product is actually and generally understood in the trade to be the same thing as milk as it comes from the cow, then it is not milk within the statute. . . . That is the question you have got to decide: Was that product which has been shown here, the method of producing which has been described, known and treated generally in the trade as milk as it comes from the

cow? Could you sell that product just as it stood on a contract which called on you to deliver milk? If you could deliver that product just as it stood, then the defendant is guilty; if you could not, then the defendant is not guilty." And this instruction was repeated more than once, in strong and unmistakable language. In his closing words to the jury, the judge said: " Is this product milk? If it is known in the trade, if it has acquired a standing in the trade as milk, then the statute applies to it, and the defendants are guilty for adding water to it."

It is not contended that the manufactured product of the defendant, to which it added water for reduction and sale, was natural milk as it comes from the cow. And we have searched the evidence in vain for anything upon which it could be found that this manufactured product had come to be known in the trade as milk. Certainly there is no such intimation in the testimony of the government, and that put in by the defendant is wholly to the effect that the defendant's " concentrated milk " was a new and unique product, manufactured only since 1908, under letters patent, at a factory equipped for that purpose, shipped to the defendant's place of business in Boston, and there extended by the defendant and put upon the market only in its diluted form. There is nothing in the evidence tending to show that the concentrated product had been dealt with in the market, or had been a subject of trade, or even had been in the hands of any dealers other than the defendant itself. A contract for the delivery of milk would not be satisfied by the delivery of this concentrated product, which must be diluted by the addition of water before it could be drunk like milk or made available for use as milk in the ordinary manner. It is no more milk within the meaning of such a contract than natural milk which does not come up to the prescribed standard. *Copeland* v. *Boston Dairy Co.* 184 Mass. 207, and 189 Mass. 342. The fact that the word " milk " in this statute has been construed to include cream as one of its natural components (*Commonwealth* v. *Gordon*, 159 Mass. 8) does not indicate that it should include also a substance produced from it by a process of manufacture with artificial appliances involving some chemical changes. The substance itself is not milk, just as butter and cheese and condensed milk are not themselves milk.

For these reasons the defendant's exceptions to the instructions given to the jury must be sustained.

But as the result thus reached is merely to send the case to a new trial, when the other questions raised by these exceptions would necessarily have to be determined, we deem it proper to consider the fundamental question whether upon the facts here presented a conviction could be supported.

So far as it bears upon this indictment, our statute provides for the punishment of any one who has in his custody or possession with intent to sell "milk to which water . . . has been added." R. L. c. 56, § 55. That is the only offense here charged. It has been suggested that as there is no dispute that the mixture which the defendant produced by adding water to its "concentrated milk" did contain water which had not come from the cow but had been added to the mixture, the mixture itself was within the meaning of the statute milk to which water had been added. But we are unable to accept this argument. If it were sound, then for the same reason one who sold or had in his possession with intent to sell ordinary condensed milk which had been so extended as to resemble natural milk in appearance would be liable to conviction upon a charge like this. But we are dealing with a penal statute, and its scope is not to be extended beyond the natural meaning of its words. When the Legislature dealt with the sale of condensed milk, it used those words. R. L. c. 56, §§ 59, 63. It is claimed, to be sure, that the defendant's product is not condensed milk, but it certainly resembles that other manufactured article more closely than it does natural milk.

Moreover, the object of our statutes regulating the sale of milk, to ensure the supply to consumers of a pure, unadulterated article of a certain nutritive value, is not interfered with by what the defendant has done. As we have seen, it was not denied that the diluted or extended mixture which it intended to sell was fully up to the required standard; it was not contended that it contained any more water, was of any less nutritive value or was less fitted in any respect for a food, than the best natural milk. If, as the evidence tended to show, the process of modified pasteurization to which the manufactured product had been subjected had resulted in greatly diminishing the number of

bacteria and in prolonging the time during which the extended mixture could safely be kept, this is neither a reason against its use nor an argument for extending the statutory prohibition so as to include a product which is neither within the common meaning of its words nor, so far as now appears, within the mischief which the statute was designed to prevent.

If it should appear in any other case that such a product as this, after having been extended into the form in which it was intended to be sold and used, had been further altered by the addition of water or any other foreign substance, whether by the defendant or by any other person, a different question would be presented. But that is not this case. So, too, if the use of the defendant's product shall be found to involve any danger to the public health, or any risk of fraud being practised by the sale of this manufactured article as milk, the Legislature undoubtedly will make proper provision against such evils. But it is not for us to extend the operation of the present statute beyond its legitimate scope.

The majority of the court are of opinion that if, as upon this bill of exceptions seems to have been the case, it was conceded by the government that the defendant's " concentrated milk " was such a substance, manufactured in such a manner, as appeared by the defendant's evidence, the jury should have been instructed to return a verdict of not guilty. If this was not the case, then the defendant's second and third requests should have been given substantially as asked for.

*Exceptions sustained.*